# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Tarek ibn Ziyad Academy,                                    Civil No. 11-1573 (DWF/JJG)
a Minnesota Public Charter School,

                    Plaintiff,

v.                                                                    **MEMORANDUM
                                                              OPINION AND ORDER**

Islamic Relief USA, a California
nonprofit corporation, and the
Commissioner of the Minnesota
Department of Education, an agency
of the State of Minnesota, in her official
capacity,

                    Defendants.

_____

Shamus P. O'Meara, Esq., Mark R. Azman, Esq., and M. Ann Mullin, Esq., Johnson and Condon, PA, counsel for Plaintiff Tarek ibn Ziyad Academy.

Sarah E. Bushnell, Esq., Kelly & Hannah PA; and Scott J. Ward, Esq., and Timothy R. Obitts, Esq., Gammon & Grange, PC, counsel for Defendant Islamic Relief USA.

Kathryn M. Woodruff and Tamar N. Gronvall, Assistant Attorneys General, Minnesota Attorney General's Office, counsel for Defendant Commissioner of the Minnesota Department of Education.

_____

## INTRODUCTION

This matter is before the Court on a Motion for Temporary Restraining Order and

a Motion for Preliminary Injunction brought by Plaintiff Tarek ibn Ziyad Academy

("TiZA").[1]  TiZA submits that emergency injunctive relief is necessary to allow it to

continue to operate as a Minnesota public charter school despite the potential expiration

of its current sponsor contract on July 1, 2011, based on a 2009 Amendment to the

Minnesota Charter School Law ("MCSL").  For the reasons set forth below, TiZA's

motion is denied.

## BACKGROUND

TiZA is a Minnesota nonprofit corporation authorized to operate as a public

charter school.  (Verified Compl. ("Compl.") ¶ 11.)  TiZA was established in 2003 under

the MCSL, Minn. Stat. § 124D.10, and currently has campuses in Inver Grove Heights

and Blaine, Minnesota.

Islamic Relief USA ("Islamic Relief") is a California not-for-profit organization

headquartered in Alexandria, Virginia.  Islamic Relief provides domestic and

international humanitarian and disaster relief and, among other things, aims to provide

impoverished people access to education and vocational training.  While not normally in

the business of sponsoring schools, Islamic Relief agreed to be TiZA's sponsor after

meeting with TiZA executives at a conference in Chicago, Illinois.  (Aff. of Sarah E.

Bushnell  ("Bushnell Aff.") ¶ 5, Ex. 3 at 43-44.)  Islamic Relief has not sponsored any

other schools.  (*Id.*)  Islamic Relief and TiZA entered into a Sponsor Contract in 2003,

---

[1]     In January 2009, the ACLU sued TiZA, the Defendants in this action, and others,
alleging that TiZA is violating the Establishment Clause by promoting the religion of
Islam (the "ACLU Action").  The parties engaged in extensive discovery, some of which
is now part of the record in the present action.  In that action, all claims against the
Minnesota Department of Education ("MDE") were dismissed and TiZA settled its
claims against Islamic Relief and the Commissioner.

and subsequently renewed the contract in 2006 and 2009.  TiZA and Islamic Relief

executed the 2009 Sponsor Contract on May 7, 2009, but by its terms, it did not become

effective until July 1, 2009.[2]  (Bushnell Aff. ¶ 14, Ex. 8.)  The term of the 2009 Sponsor

Contract is three years and is set to expire on June 30, 2012.  (*Id*. § 2.)  Section 3 of the

2009 Sponsor Contract states:  "If the authority of the . . . SPONSOR, is altered by

legislative act, this Contract is automatically modified to conform to the new law."  (*Id*.

§ 3.)

        The MDE is a state agency charged with carrying out the MCSL and dispersing

state funds.  The Commissioner is charged with approval and oversight of charter

schools.  The MDE initially rejected TiZA's application in part based on arguments that

Islamic Relief did not have a presence in Minnesota.  (Bushnell Aff. ¶ 17, Ex. 11 at

809-10.)  TiZA then engaged Dr. Wayne Jennings to serve as an Islamic Relief consultant

and a liaison to TiZA in Minnesota.  (*Id*.)  In August 2003, Dr. Jennings agreed in a

contract with TiZA that he "shall not obligate [Islamic Relief] without approval of

[Islamic Relief]."  (Bushnell Aff. ¶ 13, Ex. 1.)

        The MCSL allows for the formation of charter schools designed to, among other

things, improve student learning and encourage the use of different and innovative

teaching methods.  Minn. Stat. § 124D.10, subd. 1(a).  The MCSL requires all charter

---

[2]    TiZA's 2006 Sponsor Contract with Islamic Relief did not expire until June 30,
2009.

schools to have a sponsor (now called an authorizer).[3]  A school's sponsor/authorizer must contract with the school to provide certain oversight, including the monitoring of the school's fiscal and student performance.  A charter school cannot operate without a sponsor/authorizer.  Minn. Stat. § 124D. 10, subd. 23(b) ("If a [sponsor/authorizer] contract is terminated or not renewed under this paragraph, the school must be dissolved . . .").  When a school's contract with its sponsor/authorizer comes to an end (except for cause), the school may attempt to find a new authorizer and to obtain MDE approval of the transfer to the new authorizer.  Minn. Stat. § 124D.10, subd. 23(c).

The MCSL was revised during the 2009 legislative session.  The Commissioner submits that the primary impetus for the revisions was a *Charter School Evaluation Report* from the Office of the Legislative Auditor ("OLA"), dated June 2008 ("CSE Report").  (Aff. of Morgan Brown ("Brown Aff.") ¶ 3, Ex. 1.)  In the CSE Report, the OLA made several conclusions, including that there were differing levels of sponsor oversight.  (Brown Aff. ¶ 3, Ex. 1 at 39.)  For example, the OLA explained that some sponsors provided minimal oversight and required little information from the charter schools that they sponsored.  The OLA also made several recommendations to improve the quality and accountability of charter schools.  These recommendations included clarifying the roles of the MDE and sponsors with respect to school oversight, increasing sponsors' authority, implementing standards and providing additional training to

---

[3]   As discussed in more detail below, the MCSL was amended in 2009.  As part of these amendments, the term "sponsor" was changed to "authorizer."

sponsors, and increasing the MDE's oversight to ensure that they were meeting the standards.  (*Id*. at 47-53, 61.)

On May 16, 2009, certain amendments to the MCSL became law.  As an initial matter, the term "sponsor" was changed to "authorizer."  (*Id*.)  The legislature also adopted a more rigorous review process for authorizers and required authorizers to demonstrate their ability to oversee charter schools.  Minn. Stat. §124D.10, subd. 3(c)-(h).  In addition, and most relevant to this lawsuit, the revised legislation redefines which entities are eligible to be authorizers—making non-profit corporations incorporated outside of Minnesota ineligible to authorize charter schools (the "Minnesota incorporation provision").  Minn. Stat. § 124D10, subd. 3(b)(2)(iv).  For new authorizers, the Minnesota incorporation provision took effect on May 17, 2009.  However, for existing sponsors/authorizers (including Islamic Relief), the changes do not take effect until July 1, 2011.  *See* Minn. Stat. § 124D.10 at Note.  The delay was to provide affected parties time to address the change, either by an authorizer incorporating in Minnesota or a school entering into a contractual relationship with an eligible authorizer.  (Brown Aff. ¶ 6.)  The parties agree that the effect of the Minnesota incorporation provision in the 2009 Amendment is to disqualify Islamic Relief, a California non-profit, from continuing to be TiZA's sponsor/authorizer after June 30, 2011.

After becoming aware of the impending changes to the sponsorship/authorizer requirements, TiZA asked Islamic Relief to challenge the new Minnesota incorporation provision.  Islamic Relief declined to do so and indicated in July 2009 (and on several subsequent occasions) that it no longer wished to act as TiZA's sponsor and instructed

TiZA to immediately begin looking for a new authorizer.  (Compl. ¶¶ 31, 34 & Ex. 3;

Bushnell Aff. ¶ 10; Decl. of Beverly Perez ("Perez Decl.") ¶ 13.)

Beginning in the later part of 2009, TiZA sought out several potential new

authorizers.  (Compl. ¶ 32.)  Some of these potential authorizers failed to respond to

TiZA's inquiries, some told TiZA that they would not entertain an application from

TiZA, and at least one rejected TiZA due to the ACLU Action.  (*Id*.)  One potential

authorizer, Novation Education Opportunities ("NEO") accepted TiZA's application.  (*Id*.

¶ 34.)

In early 2010, Islamic Relief instructed Dr. Jennings on two occasions that he

must consult with Islamic Relief's attorneys before talking to the MDE or to TiZA.

(Bushnell Aff. ¶¶ 6-10.)

On October 1, 2010, Dr. Jennings signed (on behalf of Islamic Relief) a consent to

transfer agreement (the "October 2010 Change of Sponsor Letter").  (Compl. Ex. 1 (Aff.

of Wayne Jennings ("Jennings Aff.")) ¶ 31, Ex. D.)  The October 2010 Change of

Sponsor Letter stated the parties' mutual intent to terminate the 2009 Sponsor Contract

upon TiZA's transfer to a new authorizer (and MDE's approval).  (*Id*.)  The October

2010 Change of Sponsor Letter represented that "[t]here are no outstanding issues that

prevent this transfer of authorizership."  (*Id*.)  The October 2010 Change of Sponsor

Letter made no mention of the statutory termination date of the 2009 Amendment.

On November 11, 2010, counsel for Islamic Relief contacted Dr. Jennings to

discuss an issue in the ACLU Action.  Dr. Jennings informed counsel for Islamic Relief

that he had prepared a mutual transfer agreement (the October 2010 Change of Sponsor

Letter) and an updated contract performance review of TiZA, which were documents that TiZA would need to submit to the MDE with a transfer application.  Dr. Jennings sent unsigned versions of these documents to counsel for Islamic Relief on the same day. According to the notes of Islamic Relief's counsel, counsel for Islamic Relief reiterated that Islamic Relief wanted to be more involved and that Dr. Jennings should not take any action on behalf of Islamic Relief without first consulting with Islamic Relief.  (Bushnell Aff. ¶ 11.)

On November 15, 2010, Islamic Relief Corporate Counsel, Beverly Perez, wrote to Dr. Jennings and TiZA:

> While Dr. Jennings will continue to provide his valuable expertise to the benefit of both Islamic Relief and TIZA, he will pass on and report to me any communications he has concerning TIZA and no authorizer action will be valid unless approved in writing by myself or Dr. Ayoub.
>
> We recently became aware that Dr. Jennings had made certain representations purportedly on behalf of Islamic Relief to the Minnesota Department of Education and potential authorizers concerning the status of TIZA's operations without consulting with Islamic Relief, despite our direction that we needed to be involved in such matters . . . .  [W]e are required by law to identify any operational issues and cannot make representations that ignore the existence of, and issues raised in, [the ACLU Action].  Accordingly, we will modify the recently updated evaluation and the Change of Sponsor Letter.

(Jennings Aff. ¶ 32, Ex. E.)  On November 19, 2010, Ms. Perez asked Dr. Jennings, via e-mail, to determine whether the October 2010 Change of Sponsor Letter or performance review had been delivered to any third party (other than Asad Zaman at TiZA), including any potential authorizer.  (Perez. Decl. ¶ 2, Ex. A.)  She also stated, "If it is determined that the previous versions were in fact shared with any other parties, then we of course

must ensure that these same parties receive copies of the revised versions of these documents."  (*Id.*)

On or around November 21, 2010, Dr. Jennings (at Islamic Relief's direction) delivered a new version of a mutual termination agreement.  This version resolved two objections that Islamic Relief had, namely that the first version (the October 2010 Change of Sponsor Letter) did not reference the statutory termination date and that the first version did not reflect concerns Islamic Relief had concerning TiZA's governance and operations during 2010.  The same concerns were voiced in the final Contract Performance Review that was delivered to TiZA, NEO, and the MDE on March 18, 2011.  (Perez Decl. ¶ 14, Ex. M.)

On December 17, 2010, Ms. Perez instructed the MDE that "no communications sent from or on behalf of [Islamic Relief] are effective, unless signed by" Ms. Perez or Islamic Relief's CEO.  (Perez Decl. ¶4, Ex. C.)  On December 22, 2010, Islamic Relief sent TiZA another copy of a mutual termination agreement to be executed by TiZA. (Perez Decl. ¶ 5, Ex. D.)  On December 29, 2010, TiZA contended, for the first time, that the October 2010 Change of Sponsor Letter was valid and binding on Islamic Relief.  (Perez Decl. ¶ 7, Ex. F.)  On the same day, counsel for Islamic Relief responded that Islamic Relief "has not entered into an[y] agreements with TIZA in 2010.  Likewise, [Islamic Relief] has not given Dr. Jennings any authority to bind [Islamic Relief].  Dr. Jennings has never had authority to act on behalf of [Islamic Relief], a fact well known by your client."  (Perez Decl. ¶ 8, Ex. G.)  On December 30, 2010, Islamic Relief terminated Dr. Jennings.  The termination letter reads in part:

As you will remember, on numerous occasions [Islamic Relief] has clearly informed you that you have no authority to bind [Islamic Relief] in any way.  Moreover, [Islamic Relief] has instructed you to refrain from acting on [Islamic Relief's] behalf without first consulting with and obtaining explicit authorization from [Islamic Relief] . . . .  We have just learned that you signed, purportedly on [Islamic Relief's] behalf, a Change of Sponsor Letter dated October 1, 2010, which attempts to bind [Islamic Relief] to continue to be TiZA's sponsor for an indefinite period.  Given that you had no authority to sign this letter, [Islamic Relief] considers this letter null and void.  [Islamic Relief] considers your act of signing this letter without consulting with [Islamic Relief] or obtaining [Islamic Relief's] prior approval as a grave violation of our prior repeated instructions to the contrary and a serious violation of our trust.

Your actions have seriously compromised [Islamic Relief]. . . .

(Perez Decl. ¶ 9, Ex. H.)

On February 16, 2011, Islamic Relief delivered a third version of an approved mutual termination agreement to TiZA for countersignature.  (Perez Decl. ¶ 13, Ex. L.)

On February 24, 2011, NEO submitted an application to the MDE for approval of a transfer from Islamic Relief to NEO as a new authorizer (the "Transfer Application").  (Compl. ¶ 34, Ex. 3.)

On or about March 7, 2011, counsel for Islamic Relief learned from the MDE that NEO had submitted a transfer application on TiZA's behalf that contained the October 2010 Change of Sponsor Letter and the draft of the contract performance review that Islamic Relief maintains was unauthorized.  The MDE also informed counsel for Islamic Relief that, pursuant to Islamic Relief's December 17, 2010 direction, it would not accept the submissions.  Islamic Relief then submitted its final contract performance review directly to NEO, the MDE, and TiZA.  (Perez Decl. ¶ 14, Ex. M.)

On April 1, 2011, counsel for TiZA wrote to NEO and requested that NEO respond to the MDE's notice of deficiency concerning the NEO-TiZA Transfer Application.  (Compl. Ex. 4.)  Islamic Relief submitted a letter to the MDE explaining, among other things, that the October 2010 Change of Sponsor Letter was not valid. (Perez Decl. ¶ 15, Ex. N.)

On May 12, 2011, TiZA sued Islamic Relief and the MDE in Ramsey County District Court.  In the state action, TiZA brought various contract claims.  The state district court dismissed the matter for lack of subject matter jurisdiction, concluding that because the claims impacted the MDE's authorizer decision, the case was within the exclusive province of the Minnesota Court of Appeals.  The state district court urged TiZA to file a writ of certiorari if it continued to have concerns.

On June 3, 2011, the MDE completed a substantive review of NEO's second transfer application for TiZA.  The MDE denied the application, finding that NEO had not adequately addressed problems at TiZA and with its own application and proposed oversight procedure.  NEO resubmitted its application.  Review is currently pending.

On June 15, 2011, TiZA filed the current action, asserting various constitutional and contract claims.  TiZA maintains that emergency injunctive relief is necessary to allow it to continue to lawfully operate as a Minnesota public charter school in light of the fact that its current sponsor contract will expire on July 1, 2011.

## DISCUSSION

### I.      Legal Standard

Under Eighth Circuit precedent, a preliminary injunction may be granted only if the moving party can demonstrate:  (1) a likelihood of success on the merits; (2) that the movant will suffer irreparable harm absent the restraining order; (3) that the balance of harms favors the movant; and (4) that the public interest favors the movant.  *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).  None of the factors by itself is determinative; rather, in each case, the factors must be balanced to determine whether they tilt toward or away from granting injunctive relief.  *See West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986).  The party requesting the injunctive relief bears the "complete burden" of proving all of the factors listed above.  *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

### II.     Likelihood of Success on the Merits

The Court first considers whether TiZA has established a likelihood of success on the merits of its claims.  Because TiZA seeks to enjoin the enforcement of a state statute, TiZA must demonstrate more than a "fair chance of prevailing" on the merits.  *Planned Parenthood, Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008).  TiZA must show that it is "likely to prevail on the merits."  *Id*. at 731-32.  This standard "reflects the idea that governmental policies implemented through legislation . . . are entitled to a higher degree of deference and should not be enjoined lightly."  *Id*. at 732 (citation omitted).  Moreover, legislative enactments come with a presumption in favor of

constitutionality.  *See Jacobsen v. Anheuser-Busch, Inc.*, 392 N.W.2d 868, 872 (Minn. 1986).

### A.  Standing

The Commissioner argues that, as an initial matter, TiZA lacks standing to bring the alleged federal constitutional challenges.  To have standing under Article III of the Constitution, a plaintiff must allege (1) a concrete injury in fact, (2) that is fairly traceable to the challenged action, and (3) that is likely to be redressed by the relief sought.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

The Commissioner contends that, as a public school, TiZA does not have constitutional rights and therefore no standing to assert constitutional claims.  In support, the Commissioner cites to several cases from other circuits, including *Greater Heights Academy v. Zelman*, 522 F.3d 678, 680 (6th Cir. 2008) (holding that charter schools are political subdivisions and are therefore barred from invoking the protections of the Fourteenth Amendment).  TiZA argues that it is not merely a public entity, but that it is also a non-profit corporation with constitutional rights and thus standing.  In addition, TiZA points to distinctions in Minnesota law that it claims differentiates charter schools from mere "public schools."  *See, e.g.*, Minn. Stat. § 124D.10, subds. 4 & 10.  TiZA maintains that charter schools, which are a creature of the state, also have "person" status enjoyed by corporations.

The parties do not cite, and the Court has not found, any Minnesota decision directly addressing the issue of whether a charter school under the MCSL is considered a political subdivision so as to lack standing to assert constitutional rights.  While the

record indicates that charter schools under the MCSL do, by statute, have certain

characteristics that suggest they are political subdivisions, it is also true that the MCSL

requires that charter schools be incorporated under Minnesota law.  The Court assumes

without deciding, at this early stage of litigation, that TiZA has standing for the purposes

of deciding the present motion.  The Court will revisit the argument on a more fully

developed factual and legal record.[4]

### B.    Count I--Declaratory Judgment (Charter School Statute Violates U.S. Constitution)[5]

TiZA asserts that the 2009 Amendment, insofar as it prohibits out-of-state

charitable organizations from serving as sponsors as of July 1, 2011, regardless of

whether such sponsors are parties to existing sponsor contracts, violates the United States

Constitution. Specifically, TiZA asserts that:  1) the Minnesota incorporation provision

violates the Due Process Clause of the United States Constitution because it substantially

---

[4]     The Commissioner also argues that TiZA lacks standing because it cannot demonstrate that the statute was a "but for" cause of its alleged constitutional harm.  The Court respectfully denies the Commissioner's argument at this time.

[5]     Islamic Relief contends that it is not a proper defendant as to TiZA's claims regarding the constitutionality of the MCSL.  The Court agrees.  "When a statute is challenged as unconstitutional, the proper defendants are the officials whose role it is to administer and enforce the statute.  *281 Care Comm. v. Arneson*, 638 F.3d 621, 631 (8th Cir. 2011).  As a private party, Islamic Relief has no role in administering or enforcing the MCSL and therefore is not a proper defendant with respect to TiZA's constitutional claims.

In addition, the parties dispute whether TiZA must establish the alleged unconstitutionality of the 2009 Amendment "beyond a reasonable doubt."  The Court need not determine whether this more demanding standard applies because the Court determines below that TiZA has not demonstrated a likelihood of success on its constitutional claims, even under a less demanding standard.

interferes with and terminates the 2009 Sponsor Contract without cause and without notice or a hearing; (2) the Minnesota incorporation provision impermissibly and substantially impairs the 2009 Sponsor Contract between TiZA and Islamic Relief one year prior to its stated termination date in violation of the Contract Clause of the United States Constitution; (3) the MCSL's differential treatment of in-state and out-of-state charitable organizations violates the Commerce Clause of the United States Constitution because it impermissibly discriminates against interstate commerce; and (4) the 2009 Amendment's Minnesota incorporation provision violates the Equal Protection Clause of the United States Constitution.

### 1. Due Process

TiZA asserts that under the MCSL, the due process of notice, a hearing, and termination only for cause is required, and that TiZA has been denied this process due to the enactment of the 2009 Amendment and the Minnesota incorporation provision.  In short, TiZA asserts that termination of its sponsor relationship with Islamic Relief without a statutorily mandated hearing, and without explicit identification of a cause, violates due process.

The Commissioner argues that TiZA, as a government entity, does not have due process hearing rights under federal or state law.  The Commissioner also argues that TiZA, as a school district, only has the rights established by statute and that the MCSL does not provide for a hearing every time a new legislative change takes effect. Moreover, the Commissioner argues that the 2009 Amendment only indirectly results in the termination of TiZA's sponsor relationship with Islamic Relief because it was Islamic

Relief who chose not to incorporate in Minnesota.  The Commissioner also points out that the legislature provided a two-year period for affected parties to plan for and adapt to the change.

"To establish a violation of procedural due process, a plaintiff must show that he has been deprived of a constitutionally protected life, liberty or property interest." *Davenport v. Univ. of Ark. Bd. of Trs*., 553 F.3d 1110, 1114 (8th Cir. 2009).  If TiZA cannot establish a constitutionally protected interest in being able to retain an out-of-state sponsor pursuant to an existing contract, it cannot establish a due process violation.  *See Forrester v. Bass*, 397 F.3d 1047, 1054 (8th Cir. 2005) ("Only if we find a protected interest do we examine whether the deprivation of the protected interest was done in accordance with due process.").

TiZA points to Minn. Stat. § 124D.10, subd. 23, as the source of its due process rights.  That statute, however, provides for an "informal hearing" when a charter school contract is terminated by an authorizer for cause or a "public hearing" when a contract is terminated by the Commissioner for cause.  *See* Minn. Stat. § 124D.10, subd. 23(a) and (d).  The statute defines "cause" and includes the failure to meet academic requirements, the failure to meet accepted standards of fiscal management, violations of the law, or "other good cause shown."  Minn. Stat. § 124D.10, subd. 23(b).  The statute does not state or otherwise indicate that a legislative change in the MCSL constitutes "cause."  Here, the termination of the sponsor relationship between TiZA and Islamic Relief is not for cause, but instead due to Islamic Relief becoming ineligible to serve as an authorizer by operation of law.  Based on the clear language of the statute, the Court concludes that

TiZA has not demonstrated a likelihood of success in showing that it has a protected interest so as to support its procedural due process claim.

### 2.      Impairment of Contracts

TiZA argues that the Minnesota incorporation provision of the 2009 Amendment substantially impairs the 2009 Sponsor Contract in violation of the Contract Clause of the United States Constitution.

The Contract Clause of the United States Constitution provides that no state shall "pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The Court uses a three-part test to determine whether state action violates the Contract Clause. *See Am. Fed'n of State, County & Mun. Emps. v. City of Benton*, 513 F.3d 874, 879 (8th Cir. 2008); *Christensen v. Minneapolis Mun. Emps. Ret. Bd.*, 331 N.W.2d 740, 750-51 (Minn. 1983). First, the court asks whether "the state law has, in fact, operated as a substantial impairment on pre-existing contractual relationships." *Am. Fed'n of State, County & Mun. Emps.*, 513 F.3d at 879 (quotation omitted). The first prong involves inquiry into whether there is a contractual relationship, whether a change in law impairs that relationship, and whether the impairment is substantial. *Id.* If a substantial impairment exists, the court determines whether there is a "significant and legitimate public purpose behind the regulation." *Id.* (quotation omitted). If the state identifies a public purpose, the court considers "whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Id.* (quotation omitted).

Here, TiZA and Islamic Relief executed the 2009 Sponsor Contract on May 7, 2009.  The 2009 Sponsor Contract, however, did not become effective until July 1, 2009.  Therefore, it is not clear that the contract qualifies as a pre-existing contractual relationship for the impairment analysis.[6]  Moreover, TiZA is not likely to be able to show that the change in law substantially impairs its contractual relationship with Islamic Relief.  The record strongly suggests that TiZA had no reasonable expectation that it could contract with an out-of-state sponsor until July 1, 2012 because TiZA knew of the impending Minnesota incorporation provision.  Moreover, the 2009 Sponsor Contract contained an explicit self-correcting provision that would bring the contract into conformance with the new law.  (Bushnell Aff. ¶ 14, Ex. 8 ("If the authority of the . . . SPONSOR, is altered by legislative act, this Contract is automatically modified to conform to the new law."  (*Id*. § 3).)

Even if the Court assumes that the 2009 Sponsor Contract was pre-existing for the purposes of the present motion, TiZA has not demonstrated a likelihood of success on the remaining elements of its impairment of contracts claim.  The Commissioner submits that the changes were in response to the need for enhanced oversight of charter school authorizers.  The Minnesota incorporation provision is just one of several heightened requirements for authorizers and furthers the public interest in increasing oversight of Minnesota charter schools.  Based on the record before it, the Court concludes that the Commissioner has submitted sufficient evidence that the Minnesota incorporation provision is supported by a significant and legitimate public interest.

---

[6]    The amendments to the MCSL became law on or around May 17, 2009.

### 3.    Commerce Clause

TiZA asserts that the Minnesota incorporation provision benefits in-state charitable organizations and discriminates against out-of-state organizations in violation of the Commerce Clause.  "The constitutional provision of power '[t]o regulate Commerce . . . among the several States,' U.S. Const., Art. I, § 8, cl. 3, has long been seen as a limitation on state regulatory powers, as well as an affirmative grant of congressional authority."  *Fulton Corp. v. Faulkner*, 516 U.S. 325, 330 (1996) (citations omitted).  In evaluating whether a state regulatory measure violates the dormant Commerce Clause, the Court first considers whether the measure implicates interstate commerce.

The Commissioner cites to cases touching on whether public schools are actively engaged in commerce.  *See United States v. Lopez*, 514 U.S. 549, 566 (1995) (noting that the authority of Congress under the Commerce Clause "does not include the authority to regulate each and every aspect of local schools"); *United States v. Davies*, 394 F.3d 182, 195 (3d Cir. 2005) ("*Lopez* convinces us that the [Supreme] Court does not view a public school as actively engaged in commerce . . . ").  Here, TiZA has not provided any support for the proposition that TiZA, as a public charter school, is actively engaged in commerce.  Instead, TiZA asserts that it is Islamic Relief's incorporation, not TiZA's, at issue.  Even so, TiZA has not demonstrated that it is likely to succeed in showing that the Minnesota incorporation provision implicates interstate commerce.

Moreover, assuming that the Minnesota incorporation provision does implicate interstate commerce, TiZA has not demonstrated that it is likely to succeed in showing

that the Minnesota incorporation provision burdens interstate commerce.  The

incorporation requirement was enacted consistent with the state's goal of securing a

formal Minnesota presence of school authorizers.  Such presence is required of all

nonprofit authorizers.  Moreover, the availability of authorizer status, while dependent on

Minnesota incorporation, is not tied to where a business conducts its operations.  Thus,

the Court concludes that TiZA has not demonstrated a likelihood of success on its

Commerce Clause claim.

### 4.   Equal Protection

The Equal Protection Clause generally requires the government to treat similarly

situated people alike.  *Klinger v. Dep't of Corrs.*, 31 F.3d 727, 731 (8th Cir. 1994).

When a statute is subject to an equal protection challenge, the level of judicial scrutiny

depends on the type of classification utilized and the nature of the right affected.  *City of*

*Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439-442 (1985).  Here, the

parties agree that the "rational basis" level of scrutiny applies.  *See Gavin v. Branstad*,

122 F.3d 1081, 1090 (8th Cir. 1997) (noting that if a statute fails to implicate a

fundamental right or affect a "suspect" class, it is subject to the rational basis test).

Similarly, a classification neither involving fundamental rights nor proceeding along

suspect lines is accorded a strong presumption of validity.  *See, e.g., F.C.C. v. Beach*

*Commc'ns,* 508 U.S. 307, 314-315 (1993).  A law will survive "rational basis" review if

some legitimate interest exists for the statute, and the disparate treatment caused by the

statute has a rational relationship to that legitimate interest.  *See, e.g., City of Cleburne*,

473 U.S. at 440.  A classification "must be upheld against equal protection challenge if

any reasonably conceivable state of facts could provide a rational basis for the classification." *Beach Commc'ns*, 508 U.S. at 307.

TiZA contends that there is no rational basis for the 2009 Amendment's Minnesota incorporation provision and that TiZA was singled out in its consideration prior to the law's enactment. TiZA asserts that it was the only charter school operating in the State of Minnesota that was in the position to have its sponsor eliminated by the 2009 Amendment and that there is no plausible, non-discriminatory rationale for TiZA to be singled out.

The Court disagrees and concludes that TiZA has not demonstrated a likelihood of success on its equal protection claim. TiZA has not provided any evidence, beyond speculation, that would allow the Court to conclude that there was no plausible, non-discriminatory rationale for the 2009 Amendment. On the contrary, the Commissioner has submitted evidence that the Minnesota incorporation provision was enacted in response to an OLA report that was critical of sponsor oversight. The Minnesota incorporation provision was one of several changes that tightened requirements for charter school sponsors/authorizers. The Minnesota incorporation provision applies to all nonprofit authorizers and is consistent with the requirement that other authorizers (including school districts and colleges) have a Minnesota presence. Thus, the Court concludes that TiZA has not demonstrated a likelihood of success on its equal protection claim.

### C.      Count II--Declaratory Judgment (October 2010 Transfer Consent)

TiZA asserts that the October 2010 Change of Sponsor Letter is valid.  In support, TiZA argues that Dr. Jennings had the authority to act on behalf of Islamic Relief and that Islamic Relief expected Dr. Jennings to assist in the transfer process.  TiZA submits that Dr. Jennings had broad authority to carry out his duties as Islamic Relief's agent until November 15, 2010.  TiZA also asserts that when signing the October 2010 Change of Sponsor Letter, Dr. Jennings was acting with full authority and within the scope of his duties and obligations as Islamic Relief's sponsor representative to TiZA.

Islamic Relief submits that the evidence in the record shows that Islamic Relief did not know about the October 2010 Change of Sponsor Letter until December 2010; that Islamic Relief never consented to its contents; and that Islamic Relief now rejects the terms of the purported agreement.

After a review of the record before it, the Court concludes that TiZA is not likely to prevail on the merits of its claim seeking a declaration that the October 2010 Change of Sponsor Letter is valid and binding.  The record demonstrates that in an August 2003 contract with TiZA, Dr. Jennings promised not to obligate Islamic Relief without Islamic Relief's approval.  (Bushnell Aff. ¶ 13, Ex. 1.)  The record also demonstrates that Islamic Relief regularly instructed Dr. Jennings that he must consult with Islamic Relief before taking action with respect to sponsorship on their behalf.  Dr. Jennings' testimony that he had authority to sign the October 2010 Change of Sponsor Letter is contrary to other

testimony given by Dr. Jennings, namely that he was not personally authorized to sign off

on sponsorship.  (Bushnell Aff. ¶ 4, Ex. 2 at 97-98.)[7]

On the record as a whole, the Court concludes that TiZA is not likely to succeed

on this claim.

### D.     Count III--Declaratory Judgment (Application of the 2009
             Amendment)

TiZA alleges that the Minnesota incorporation provision does not alter the term of

the 2009 Sponsor Contract or the criteria for Islamic Relief to remain as TiZA's sponsor

for the duration of the 2009 Sponsor Contract.  TiZA asserts that the Minnesota

incorporation provision contemplates that existing sponsors who are parties to existing

sponsor contracts and who do not have an interest in becoming an authorizer may simply

serve out the term of their contracts.  In support, TiZA points out that the Commissioner

has not commenced termination proceedings and has delayed in implementing the

process by which applicants may apply to be an authorizer.

The Court concludes that TiZA has not demonstrated a likelihood of success on

this claim.  First, TiZA points to nothing in the language of the statute that would exempt

Islamic Relief (as an out-of-state sponsor not intending to become an authorizer) from the

Minnesota incorporation provision.  Moreover, whether or not the Commissioner has

commenced termination proceedings against TiZA is immaterial.  The 2009 Sponsor

Contract is not ending because of termination.  Instead, it will end based on the fact that

---

[7]     Even assuming that Dr. Jennings had the authority to sign off on the October 2010 Change of Sponsor Letter, that letter makes no reference to the legislative deadline that the parties were aware of as far back as May 2009.

Islamic Relief will be ineligible to continue as TiZA's sponsor by operation of law going into effect on July 1, 2011. TiZA's additional argument that the Commissioner has delayed is similarly without merit and unsupported by the record.

### E.   Count IV--Breach of Contract

TiZA asserts that Islamic Relief has breached the 2009 Sponsor Contract by refusing to accept the validity of the October 2010 Change of Sponsor Letter, demanding TiZA's consent to terminate the 2009 Sponsor Contract, and anticipatorily repudiating the 2009 Sponsor Contract as of July 1, 2011. TiZA also argues that in repudiating the October 2010 Transfer Consent Letter, Islamic Relief breached the same.

To recover on a breach of contract claim under Minnesota law, TiZA must prove, (1) the formation of a contract; (2) the performance of conditions precedent; and (3) the breach of the contract. *Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907, 918 (Minn. Ct. App. 2008).

The Court finds that TiZA is not likely to prevail on its breach of contract claim. First, as discussed above, TiZA has not demonstrated a likelihood of success in showing that the October 2010 Change of Sponsor Letter is valid and binding. Therefore, TiZA is unlikely to succeed in its claim that Islamic Relief has breached any contract for refusing to accept its validity. Second, the court rejects TiZA's remaining arguments in support of its breach of contract claims, which deal with the alleged breaches of the 2009 Sponsor Contract. Section 3 of the 2009 Sponsor Contract explicitly provides that "[i]f the authority of the . . . SPONSOR, is altered by legislative act, this Contract is automatically modified to conform to the new law." (Bushnell Aff. Ex. 8.) Thus, the Court finds that it

is unlikely that TiZA will be able to demonstrate that Islamic Relief breached the 2009 Sponsor Contract by acknowledging that the 2009 Sponsor Contract will terminate on July 1, 2011 or by ending its sponsorship as of that same date.[8]

### F.    Count V--Breach of Fiduciary Duty

TiZA alleges that Islamic Relief breached its fiduciary duty to TiZA by impeding TiZA's ability to obtain an approval of transfer to a new authorizer, demanding TiZA's consent to prematurely terminate the 2009 Sponsor Contract, and contending that the 2009 Sponsor Contract ends before its stated termination date of June 30, 2012.

Here, the only relationship between TiZA and Islamic Relief is contractual and at arm's length.  *W.K.T. Distrib. Co. v. Sharp Elecs. Corp.*, 746 F.2d 1333, 1336-37 (8th Cir. 1984) (no fiduciary relationship between parties dealing at arm's length).  Moreover, the record does not demonstrate that Islamic Relief possessed any superior knowledge in the area of charter school oversight or operation.  Thus, the Court concludes that TiZA has not shown a likelihood of success in demonstrating that a fiduciary relationship existed.

### III.    Irreparable Harm

TiZA must also establish that irreparable harm will result if injunctive relief is not granted and that such harm will not be compensable by money damages.  *See Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986).  TiZA asserts that because of the change in law set to occur on July 1, 2011, its sponsorship relationship with Islamic

---

[8]    TiZA also argues that Islamic Relief has violated the duty of good faith and fair dealing.  The Court concludes that this claim is unlikely to succeed for the same reasons discussed above.

Relief will end and potentially cause TiZA to cease operating as a charter school.  TiZA
asserts that if it is forced to shut-down, it will be unable to serve its 540 students for the
2011/2012 school year and beyond, and will leave its staff of nearly 70 jobless.  There is
no doubt that such harm is severe and will sadly be experienced primarily by the students
and their families at TiZA.

However, it has also long been recognized that a plaintiff's delay in seeking relief
may justify denying a request for injunctive relief because it belies claims of irreparable
injury.  *See, e.g.*, *Hubbard Feeds*, *Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598,
603 (8th Cir. 1999) (holding that plaintiff's delay in seeking preliminary injunction
"belies any claim of irreparable injury pending trial," and recognizing that delay in
seeking injunction, standing alone, may justify denying request).  The record
demonstrates that TiZA has not only been aware of the impending changes in the MCSL
that it now challenges for more than two years, but that TiZA has known for
approximately the same period of time that Islamic Relief declined to challenge the
constitutionality of those changes and would no longer be their sponsor after June 30,
2011.  In addition, the record demonstrates that TiZA has known about Islamic Relief's
position regarding the validity of the October 2010 Change of Sponsor Letter for more
than seven months.  Notwithstanding their knowledge of the impending legislative
deadline, TiZA waited until mid-May 2011 to file a lawsuit in the state district court.
When that case was dismissed on May 25, 2011,with the recommendation that TiZA file
a writ of certiorari to the state appellate court, TiZA chose to wait again until June 15,
2011, only two weeks prior to the effective date of the challenged legislation, to file the

present lawsuit.  While there is little doubt that TiZA has demonstrated irreparable harm, there is also little doubt that TiZA's unjustified delay contributed at least in part to that harm.  TiZA's delay is also responsible for the fact that the harm is being magnified by the immediately pending legislative deadline and the fact that this issue is being litigated on the eve of that deadline.

## IV.   Balance of Harms and Public Interest

As discussed above, if TiZA is required to close its doors, the harm to its students, families, and staff will obviously and sadly be great.  Defendants, too, however, have demonstrated harm in the event that TiZA prevails on its motion for a temporary restraining order.  Islamic Relief will be harmed if it is ordered to continue as TiZA's sponsor until the Commissioner approves the transfer of TiZA to a new authorizer, an event that may or may not occur.  Moreover, the Commissioner would be harmed by being precluded from enforcing a duly-enacted state law and to the extent that the Commissioner might be required to continue to pay out state funds until the matter is resolved.  Even so, the Court finds that the harm to TiZA would outweigh the relative harm to the defendants.  However, the Court also considers the public's interest in a transparent and accountable public charter school system and in maintaining the integrity of the state statutes, which weighs in favor of denying an injunction.

## CONCLUSION

On balance, the Court concludes that even accepting the harm to TiZA, in light of TiZA's failure to demonstrate a likelihood of success on the merits of any of its claims,

TiZA has failed to demonstrate that it is entitled to a temporary restraining order or preliminary injunction.  Accordingly, the Court denies TiZA's motion.

At the end of the hearing on this matter on June 28, 2011, counsel for TiZA requested that in the event that the Court should deny their motion, the Court issue an injunction pending an appeal under Rule 8 of the Federal Rules of Appellate Procedure. While TiZA and its students will likely suffer severe harm should TiZA cease operating as a charter school, TiZA has wholly failed to show that it is likely to succeed on the merits of any of its claims.  Moreover, TiZA delayed for nearly two years before asserting its constitutional challenges to the impending changes to the MCSL. Accordingly, the Court denies TiZA's request for an injunction pending appeal.

Based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS ORDERED** that:

1.      TiZA's Motions for Temporary Restraining Order (Doc. No. [3]) and Preliminary Injunction (Doc. No. [6]) are **DENIED**.

2.      TiZA's request for an injunction pending an appeal under Rule 8 of the Federal Rules of Appellate Procedure is **DENIED**.


Dated:  June 30, 2011                    s/Donovan W. Frank
                                         DONOVAN W. FRANK
                                         United States District Judge